UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DAVID A. SAWICKI,

                                    Plaintiff,



                                                                    **REPORT**
v.                                                                  **AND**
                                                                    **RECOMMENDATION**

                                                                    13-CV-681A


CAROLYN COLVIN, Acting
Commissioner of the
Social Security Administration,

                                    Defendant.
_____


## INTRODUCTION

        This case has been referred to me by Hon. Richard J. Arcara for supervision of pretrial

proceedings, including the preparation of a Report and Recommendation on dispositive motions.

[5]. [1] This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination

of the defendant Acting Commissioner of Social Security that plaintiff was not entitled to Social

Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

Before me are the parties' cross-motions for judgement on the pleadings [7, 11].

        For the reasons stated below, I recommend that this case be remanded to the Acting

Commissioner for further proceedings.

_____
[1]   Bracketed references are to the CM/ECF docket entries.

## PROCEDURAL BACKGROUND

Plaintiff David A. Sawicki filed an application for DIB on January 22, 2010 and for SSI on January 30, 2010 (T. 128, 137).[2] He states that the onset date of his disability was November 1, 2009 (T. 130). His initial application was denied (T. 74-83). An administrative hearing was subsequently held before Administrative Law Judge Roxanne Fuller on July 19, 2011 (T.49).  On July 22, 2011, ALJ Fuller determined that although plaintiff was unable to perform his past relevant work, he retained the residual functional capacity to preform substantial gainful activity (T. 23).

Plaintiff initially requested Appeals Council review of ALJ Fuller's decision on September 20, 2011 (T. 30). Additional time was requested by plaintiff's counsel to obtain further medical records (T. 31). On August 24, 2012, plaintiff (not plaintiff's counsel) wrote to the Appeals Council stating that the appeals process had "not been good for [his] mental health" and that he had asked his attorney to withdraw the appeal (T. 12). Correspondence from the Appeals Council dated October 31, 2012, sought to confirm plaintiff's intention to withdraw his appeal (T. 10).  On November 13, 2012 plaintiff's attorney represented that she was going to go to plaintiff's apartment to see him because he had cancelled multiple appointments with her (T. 183). In a letter to the Appeals Council dated December 10, 2012, plaintiff's counsel thanked the Appeals Council for their patience and represented that plaintiff's "current condition is not stable" (T. 187). In that letter, plaintiff's counsel affirmed the plaintiff's desire to proceed with the appeal and submitted additional medical reports. Id.

On January 11, 2013, the Appeals Council, apparently unaware of the December 10, 2012 letter, stated that inasmuch as it had not heard from plaintiff or plaintiff's counsel as of January 11, 2013, it deemed the appeal withdrawn and dismissed the appeal (T. 7). On January

---

[2]   References denoted as "T" are to the transcript of the administrative record.

16, 2013, plaintiff's counsel wrote to the Appeals Council stating that plaintiff had, in fact, responded prior to the Appeals Council's January 11, 2013 decision (T. 193).   In a decision dated May 2, 2013, the Appeals Council set aside its earlier decision in light of correspondence and evidence from plaintiff's counsel reflecting that plaintiff wished to pursue the appeal (T. 1). The Appeals Council acknowledged receiving the correspondence from plaintiff's counsel dated November 13, 2012, December 10, 2012 and January 16, 2013, as well as medical records from Dr. Carol Jo Descutner and the Veteran's Medical Center/Upstate New York HCS (T. 5). The Appeals Council stated that it considered medical records from Debra Henderson and Dr. Gupta, but noted that these documents were already in the record (T. 2).  The Appeals Council stated that it also reviewed the records from the Upstate New York HCS, but stated that these documents post-dated ALJ Fuller's July 11, 2011 decision. Id.[3]  The Appeals Council refused to alter ALJ Fuller's decision making the ALJ's determination the final decision of the Acting Commissioner (T.1-5).  Plaintiff thereafter commenced this action.

The plaintiff is a former United States Marine (T. 13).  The record reflects that plaintiff has a service connected disability evaluation of 70 percent, but is considered by the United States Department of Veterans Affairs ("VA") to be totally and permanently disabled due to his service connected disability. Id. He has a high school education and was 45 years old at the time of the administrative hearing (T. 23). His past relevant work was as a sheet metal worker, a construction worker and a cap maker Id. Plaintiff alleges that he is disabled due to mental health problems including anxiety and attention deficit disorder, as well as drug and alcohol dependence (T. 156).

---

[3]   This appears to be incorrect. The record reflects that the report by Descutner, a psychologist who works at the Veteran's Medical Center/Upstate New York HCS, was based upon her examination of plaintiff on April 20, 2011 (T. 301). She had also seen plaintiff on October 6, 2010 (T. 280, 306).

## BACKGROUND

**Medical Evidence**

Records from the Catholic Health System reflect that plaintiff was seen on December 23, 2008 due to complaints of lower back pain (T. 210) with a follow-up on January 9, 2009 (T. 209). It was noted that he was anxious and fidgeting (T. 210). He was diagnosed with a low back sprain and told to rest, apply ice and heat treatment. Id.

On April 6, 2009 plaintiff was seen by Dr. Abdul Hakeem Syed, a psychiatrist at Lake Shore Behavioral Health (T. 203). Dr. Syed noted plaintiff's history of drug use which began in plaintiff's 30's and was heaviest from 1999 to 2002. Id. It appears that plaintiff primarily used cocaine. Id. Plaintiff reported occasional decreased sleep, some racing thoughts, feeling anxious and nervousness. Id. At that time, plaintiff reported that his condition was not "over powering" and did not debilitate him. Id. Dr. Syed noted that plaintiff "always fears the worst is going to happen." Id. Plaintiff described himself as being hyper, inattentive in class and fidgety during his school years. Id. Dr. Syed also noted plaintiff's past history of psychiatric treatment which included outpatient treatment for drug and alcohol use; attending the Lackawanna Counseling Center in 2001; residing at the Westin Mill's halfway house for 6 months; and receiving rehabilitation treatment at BryLin Hospital in 1998 and 1999. Id. Dr. Syed administered an ADHD self-report check list which resulted in a possible diagnosis of ADHD (T. 204).

Plaintiff again saw Dr. Syed on April 13, 2009 (T. 205). On this occasion, plaintiff reported that he agreed with Dr. Syed's diagnosis of ADHD and agreed to go on Strattera as treatment for ADHD. Id. Records reflect that plaintiff was seen at Lake Shore Behavioral Health on May 11, 2009 and July 6, 2009, but there are no reports other than notations that plaintiff was continued on Strattera (T. 207).

Dr. Renee Baskin conducted a consultative psychiatric evaluation of plaintiff on March 24, 2010 (T. 212).  Dr. Baskin noted that plaintiff began receiving treatment for his psychological conditions from Lake Shore Behavioral Health in September 2009. Id.  She noted that depressive symptomatology is remarkable for dysphoric moods, feelings of hopelessness, fatigue/loss of energy, social withdrawal, thoughts of death or suicide (T. 212-13).  She also noted that anxiety symptomatology was remarkable for excessive apprehension and worry, fearfulness, restlessness and muscle tension (T. 213).  Further, she noted that plaintiff has panic attacks which include palpitations, breathing difficulties and racing thoughts. Id. Dr. Baskin stated that plaintiff "is in an almost constant state of anxiety." Id. She also found that manic symptomatology was remarkable for mood changes. Id. Cognitive symptomatology was remarkable for short term memory deficits and concentration difficulties. Id.  Dr. Baskin noted plaintiff's past history of drug use, arrest on misdemeanor charges in 2009 and involvement in Veterans Mental Health Court which mandated counseling at Lake Shore Behavioral Health. Id.

Upon examination, Dr. Baskin noted that plaintiff's affect was "markedly anxious and tense" and his mood was "dysthymic" but plaintiff was pleasant, polite, personable and easily engaged (T. 214). She found plaintiff's attention and concentration to be mildly impaired due anxiety but that plaintiff was able to count, do simple calculations and serial threes "albeit slowly and hesitatingly." Id.  Recent and remote memory skills were also found to be mildly impaired and plaintiff's intellectual functioning was found to be in the low to below average range. Id. Plaintiff's insight was fair and his judgement was "fair to poor." Id. Dr. Baskin concluded that plaintiff would have minimal to no limitations in his ability to follow and understand simple directions and instructions and perform simple tasks (T. 215). However, she also determined that plaintiff had a moderate limitation in being able to maintain attention, concentration and

maintain a regular schedule. Id. Dr. Baskin stated that plaintiff would have significant limitations being able to make appropriate decisions, relate adequately with others and appropriately deal with stress. Id.  She concluded that plaintiff's condition "may significantly interfere with the claimant's ability to function on a daily basis." Id. She diagnosed plaintiff as suffering from generalized anxiety disorder, drug and alcohol abuse, and recommended that plaintiff continue with psychological treatment and might consider "more intensive intervention and/or day treatment program." Id. Her prognosis was "guarded given the claimant's history, current presentation and continued use of alcohol." Id. She also found that plaintiff would not be able to manage his own funds due to substance abuse. Id.

The record contains a "Psychiatric Review Technique" dated April 5, 2010, which appears to be a non-examining review of medical records by an individual identified as "Andrews, T., Psychology" (T. 217). This individual's credentials are not in the record, and the record does not reflect what medical reports he reviewed. Andrews stated that plaintiff suffered from anxiety related disorders and substance abuse disorders. Id.  Andrews concluded that the records substantiated the presence of plaintiff's generalized anxiety disorder (T. 222) and drug and alcohol dependence (T. 225) but that these impairments did not satisfy the listings.  Id. Although Andrews noted that he reviewed the report of Dr. Baskin's March 24, 2010 examination of plaintiff (T. 229), he apparently disagreed with Dr. Baskin's finding that plaintiff's psychiatric and substance abuse problems "significantly interfere" with plaintiff's ability to function on a daily basis (T. 215), inasmuch as Andrews found that plaintiff had no limitations in his activities of daily living (T. 227). Andrews did find that plaintiff had a moderate degree of difficulty in the functional areas of social functioning and maintaining concentration. Id.

On April 9, 2010, plaintiff was seen at Lake Shore Behavioral Health by Dr. Patrick Hurley, a physician (T. 235). Dr. Hurley noted plaintiff's complaints that he was sad or blue every day; that his sleep is poor; that he has thought about dying but has no plan for suicide; that he feels guilty and worthless; that he worries excessively; that he has a loss of pleasure but enjoys watching television; and that his concentration and energy levels are impaired. Id. Upon examination, Dr. Hurley stated that plaintiff was difficult to engage at first "but then was frequently tearful as he described his difficulties getting work and struggling with anxiety" (T. 236).  He found that plaintiff "appeared too overwhelmed by symptoms that meet the criteria for Depression to be able to function in an occupational setting." Id. Dr. Hurley advised the plaintiff that he was concerned about prescribing Xanax due to potential abuse in light of plaintiff's history. Id. He warned plaintiff not to take Xanax with alcohol or any other recreational drug. Id. He diagnosed plaintiff as suffering from major depressive disorder with a history of alcohol and cocaine abuse; obesity; stressors which include financial difficulties, lack of relationship success and recurrent return to drug and alcohol abuse; and a Global Assessment of Functioning ("GAF") score of 45. Id.

Dr. Hurley saw plaintiff again on May 7, 2010 (T. 237). On this occasion, Dr. Hurley noted that plaintiff was improved with the use of Xanax, but that plaintiff "still has difficulties with sleep, loss of pleasure, poor concentration, excessive worry and feelings of guilt and worthlessness. Id. With respect to his medications, plaintiff stated that he had taken Zoloft in the past with uncertain success, but he was willing to try it again. Id. Although Dr. Hurley noted that plaintiff's Major Depressive Disorder and sever anxiety was "somewhat improved," he found it appropriate to increase plaintiff's dosage of Xanax and to start plaintiff on Zoloft. Id.

In a report dated July 15, 2010, Dr. Hurley noted that plaintiff was "upset" because he had to switch programs in order to "get day program support" which meant that he could keep his therapist but would need a new psychiatrist (T. 238).  Dr. Hurley noted that Zoloft has been "helpful" but that plaintiff still occasionally took extra Xanax. Id. Plaintiff complained that his sleep was still interrupted because he worried excessively. Id. Upon examination, plaintiff became tearful when he discussed his burdens. Id. Dr. Hurley added Generalized Anxiety Disorder to his prior diagnosis of Major Depressive Disorder. Id. Once again, Dr. Hurley determined that it was appropriate to increase plaintiff's medications, this time increasing the dosage of Zoloft. Id.  Dr. Hurley discussed the possibility of starting plaintiff on additional medications, but plaintiff was reluctant to do so. Id. Dr. Hurley stated that plaintiff should follow up with his new psychiatrist Id.

Plaintiff began seeing Dr. Dham Gupta, a psychiatrist, on September 17, 2010 (T. 239). Dr. Gupta noted that plaintiff wanted to be able to work, and if he was unable to work he would apply for Social Security Disability benefits. Id. Dr. Gupta noted plaintiff's history of depression, anxiety and drug abuse. Id. He also noted plaintiff's complaints of depressed mood, intense anxiety, feeling like a failure, low self-esteem and sometimes difficulty sleeping. Id. Plaintiff reported that Zoloft did not seem to be doing anything, but that Xanax helped to control his anxiety. Id.  Dr. Gupta noted that the plaintiff "had right shoulder replacement done recently." Id. He also noted the plaintiff had twice received inpatient treatment at BryLin Hospital. Id. Plaintiff reported that he had been "clean and sober" for over one year. Id. Dr. Gupta found no evidence of acute psychotic symptoms and that plaintiff's judgment and insight were fair (T. 240). Because Zoloft did not appear to benefit plaintiff, Dr. Gupta switched plaintiff to Prexeva (a brand of Paxil). Id. Dr. Gupta diagnosed plaintiff as suffering from Depressive Disorder. Id.

A health review prepared on October 1, 2010 by Valarie Arnone, a Physician's Assistant student, along with RN Barbara Hoekstra, at Lake Shore Behavioral Health reflects that plaintiff had current complaints of sleep disorder, arthritis/rheumatism, chronic pain (T. 243). Plaintiff's total shoulder replacement surgery on August 17, 2010 and a prior thumb injury which resulted in a partial loss of plaintiff's right thumb were also noted (T. 244). Medications taken by plaintiff at that time included Xanax, Prexeva and Lortab for pain. Id. Upon examination, plaintiff was found to have a limited range of motion of the right shoulder with pain with abduction and rotation (T. 246).

The record reflects that plaintiff was being followed by Debra Henderson, M.S., with respect to his counseling at Lake Shore Behavioral Health (T. 249). On October 15, 2010, she described plaintiff's goal as wanting "to feel better about myself and less anxious so I can live financially independent and develop quality relationships."  Id. Plaintiff was scheduled to attend group and individual meetings in the PROS Program at Lake Shore Behavioral Health two days a week. Id. She noted that plaintiff struggled with making it to scheduled appointments and stressed that plaintiff needed to stay on schedule or he may face consequences with respect to his "court issues." Id. At a meeting with Henderson on October 26, 2010, plaintiff was reported as appearing "quite anxious" about his court appearances and his attendance at the PROS program (T. 250).  On October 29, 2010, Henderson reported that plaintiff had been attending more regularly and that he received services relating to anxiety management, self-esteem, coping, and managing depression (T. 251).  In a report dated November 15, 2010, Henderson noted that plaintiff's attendance was somewhat better, but that plaintiff "continues to struggle with anxiety" and that he was very concerned about his finances (T. 252).  Plaintiff was anxious again during a meeting on November 15, 2010 and expressed similar concerns to Henderson (T. 253).

According to Henderson's November 30, 2010 report, plaintiff's attendance was good and he was "making great efforts" to attend classes and participate in group discussions (T. 254). She noted that while plaintiff talks with others in group discussions, "he has not been observed talking with others outside of classes." Id. She encouraged plaintiff to identify those he feels comfortable having a conversation with, work to learn their names and initiate conversations with them in the future. Id. Other records from the Lake Shore PROS Program reflect that plaintiff was seen on December 13, 2010 to meet with Jillian Getter regarding his financial situation (T. 255). Getter reported that plaintiff was experiencing "a lot of anxiety" especially as a result of his financial situation. Id.

On December 15, 2010, Henderson noted that plaintiff "at times is quite anxious about various issues and gets worked up over things quite easily" (T. 257).  On December 30, 2010, Henderson reported that plaintiff's attendance was low due to illness but that she spoke to him over the phone (T. 258).  During that discussion, plaintiff stated that "he would really like to have a meaningful relationship with someone in the future." Id.  In a January 4, 2011 report, Henderson noted that plaintiff had been approved for Veterans' benefits but that he was worried about them being taken away from him (T. 269). On January 18, 2011, Henderson reported that plaintiff was excited about receiving the Veterans' benefits and that the financial security has aided him greatly in calming his nerves (T. 261). After their meeting on January 24, 2011, Henderson noted that plaintiff expressed "much anxiety" and was "quite upset" apparently because he lost his wallet (T. 262). Two days later, on January 26, 2011, Henderson reported that plaintiff did not feel safe in his new apartment and that he does not like his neighbors (T. 263). Plaintiff stated that he "was losing it" and needed to move. Id.

A PROS Progress Note dated January 31, 2011 reflects that plaintiff's attendance continued to be somewhat irregular and that plaintiff struggled with socializing with others (T. 264). Henderson stated that plaintiff did not seem to be very interested in socializing with his peers outside of class. Id. She also noted that plaintiff had advised her that he had found his wallet. Apparently, he had forgotten that he had hidden his wallet in his sock drawer.[4] He had already replaced his license and insurance card, but did not mind having duplicates.  Id.

On February 14, 2011, Henderson reported that plaintiff still "struggles at times with anxiety and mood changes" (T. 296). He was encouraged to keep regular attendance with counseling sessions. Id.

Dr. Gupta and Henderson completed a Social Security Administration Psychiatric Report on February 17, 2011 (T. 271).[5]  The report reflects that plaintiff continued to experience loss of interest in almost all activities, sleep disturbance, feelings of guilt and worthlessness and had difficulty concentrating. Id. It was noted that plaintiff's generalized anxiety was accompanied by motor tension, autonomic hyperactivity and apprehensive expectation.  Id. The report stated that plaintiff experiences great anxiety at times, especially in regards to financial and housing issues. Id. It was also noted that he has physical limitation due to his shoulder replacement and poor concentration and that plaintiff struggled with coping and can get overwhelmed with emotions and worries (T. 271-72).  Plaintiff's condition was expected to last at least 12 months. Id. Dr. Gupta and Henderson opined that plaintiff could not meet the demands of competitive work, noting that plaintiff's anxiety "at times is quite extreme and could greatly impact his work performance, especially in a stressful situation. He has many barriers related to this to overcome

---

[4]    ALJ Fuller did not discuss this evidence of plaintiff's memory deficit in her decision.

[5]    This is a corrected Psychiatric Report. The original report issued by Henderson did not note that plaintiff continued to experience a pervasive loss of interest in almost all activities, sleep disturbance or motor tension associated with this generalized anxiety disorder (T. 265).

in order to be successful in an employment setting." Id. Plaintiff's difficulties in social functioning were rated as moderate. Id.

Dr. Carol Jo Descutner, Ph.D., a licensed psychologist, completed a Disability Benefits Questionnaire on April 20, 2011 apparently in connection with plaintiff's application for VA benefits (T. 301). Plaintiff was diagnosed as suffering from major depressive disorder (moderate); anxiety disorder; and substance abuse in remission (T. 302). Dr. Descutner noted that plaintiff suffered from depressed mood, anxiety, suspiciousness, chronic sleep impairment, panic attacks more than once a week, and impairment of his short and long-term memory (T. 303). She also found that plaintiff experiences disturbances of motivation and mood, difficulty establishing and maintaining effective work and social relationships, suicidal ideations, obsessional rituals that interfere with routine activities, near-continuous panic or depression affecting the ability to function effectively, neglect of personal appearance and hygiene, and difficulty adapting to stressful circumstances, including work in a work-like setting (T. 303).

Upon examination, Dr. Descutner observed that plaintiff was "restless and anxious" and found it a challenge to sit still (T. 309). She noted that plaintiff was moving constantly at some points. Id. Plaintiff was able to spell the word "world" forward but had difficulty spelling it backwards even after three attempts. Id. Plaintiff reported suicidal ideations in the past, but not at the time of the examination. Id. Plaintiff reported that he stays in his pajamas for up to 2 days; that he prepares his own meals, but has difficulty shopping because he experiences anxiety when faced with all of the selections; that he has "low moods" more days than not and crying spells on many days; that he experiences insomnia lasting many hours; that he has feelings of worthlessness and difficulty concentrating while reading the newspaper (T. 310). Dr. Descutner assigned a GAF score of 45 to plaintiff "based upon notable depression and some anxiety

symptoms with serious impairment in social and occupational functioning." Id. Dr. Descutner concluded:

> "It is also my professional opinion that the Veteran's depression has at least as likely as not resulted in deficiencies in work functioning, relationships, and mood. It is likely that the Veteran used alcohol at times for self-medication of his depressive symptoms. He has had serious disruption of this occupation and social functioning since the military. . . . The Veteran's many years of substance abuse have likely [played] an important role in his deficiencies, but it does not supersede the impact of depression on his poor social and occupational functioning."

(T. 311). Her prognosis for plaintiff was guarded due to plaintiff's "long-standing mental health problems." Id.

Plaintiff was seen by Dr. Gupta on May 5, 2011 (T. 297). At that time, Dr. Gupta reported that plaintiff was doing very well and denied feeling depressed or anxious. Id.  He noted that plaintiff's mood was euthymic[6] with congruent affect. Id.  The plaintiff reported that Pexeva and Xanax were working well. Id.  On June 16, 2011, Dr. Gupta noted that plaintiff was again doing very well (T. 298). Plaintiff denied feelings of depression or anxious, and his mood was again euthymic with bright affect. Id. He also reported that his medications were working fine. Id.

Dr. Gupta also completed a mental residual functional capacity assessment dated July 14, 2011 (T. 275).  He stated that plaintiff's ability to understand, remember and carry out instructions was affected by his impairment. Id.  Dr. Gupta opined that plaintiff had "marked" restrictions in his ability to understand and remember simple instructions, carry out simple instructions, make judgments on simple work-related decision, understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. Id. Dr. Gupta stated: "[w]hen [plaintiff] is in a state of high anxiety and/or

---

[6]    According to Stedman's Medical Dictionary (27th Edition. 2000), euthymia reflects a moderation of mood, not manic or depressed.

depression he struggles greatly with making simple decisions and/or following instructions (i.e. simple or complex). [Plaintiff ] becomes overwhelmed, anxious and agitated and becomes so bothered at times he experiences panic attacks. This in turn makes it very difficult for [plaintiff ] to socially interact with others and/or function effectively in a work setting." Id. Dr. Gupta found that plaintiff's impairment affects plaintiff's ability to interact appropriately with supervision, co-workers, and the public or to respond to changes in the routine work setting (T. 276). He opined that plaintiff had "marked" restrictions in his ability to interact appropriately with the public, supervisors, co-workers, or to respond to changes in a routine work setting. Id. Dr. Gupta stated that plaintiff had "utilized alcohol and substances in the past to cope with his symptoms of anxiety and depression" but was in remission for cocaine and alcohol use. Id.

The record also includes the determination by the VA finding that plaintiff's major depressive disorder is a service connected disability based upon records demonstrating that plaintiff was treated for a mental condition during military service (T. 280).  The VA further determined that plaintiff was entitled to an individual unemployability adjustment because he was found to be unable to "secure or follow a substantially gainful occupation as a result of service-connected disabilities" (T. 283-286).

Records from the VA's Upstate New York Healthcare System reflect that plaintiff was followed there with respect to his shoulder replacement surgery and knee pain (T. 313-327). He was seen on March 25, 2011 for pain in his right shoulder and left knee (T. 317). A depression assessment on that date noted stresses causing depression that may lead to thoughts of suicide, but failed to identify any risk factors (T. 318).  Plaintiff denied depression or anxiety at that time (T. 319). During this visit, it was noted that plaintiff was prescribed hydrocodone and fentanyl patches for pain (T. 325).  Plaintiff stated that he has not been using the fentanyl patches for the

last 10 days because the "don't make him feel right" (T. 326). He stated that he would like to be

off all pain medication. Id. The records from that visit reflect that the VA formulary no longer

included fentanyl patches, but used morphine SA as an alternative. Id. Plaintiff was seen again

on April 22, 2011 regarding shoulder pain (T. 313-16). Plaintiff was advised to continue with

Lortab for pain as needed (T. 316).  He was also seen on July 8, 2011, at which time he was

counseled about the health risks associated with obesity (T. 313).  Plaintiff was next seen on

February 9, 2012 (T. 327). At that time, plaintiff's chief complaints were chronic pain in his right

shoulder and left knee, depression and vitamin D deficiency. Id.


**The Administrative Hearing**

The administrative hearing took place on July 19, 2011 (T. 51).  ALJ Fuller asked

plaintiff why he cannot work (T. 54). Plaintiff testified that simple tasks are overwhelming to

him, that something as simple as making Hamburger Helper gives him a hard time (T. 55).

When asked about his past work at New Era Cap Company, plaintiff testified that he had a

simple repetitive task, but he wasn't able to maintain the speed that was necessary (T. 56).

Plaintiff stated that he was terminated from that position because of his drinking. Id. Plaintiff

testified that he does not keep a checkbook and that "Social Services" pays his bills without him

having to forward the bills to them (T. 57).  He grocery shops but he gets overwhelmed by

having to make decisions and his anxiety and panic flare up. Many times he has to just walk out

of the store. Id. His mother comes over to help with household chores (T. 58).

Plaintiff testified that he drives, but only within a mile or two radius of his house and he

gets very nervous, overwhelmed and panicky. Id.  When asked if his medication helped him with

those symptoms, plaintiff stated that the reason he was an hour and a half late meeting his

attorney before the hearing (T. 52) was because his medication makes him groggy. Id.  Plaintiff

stated that he has "absolutely no energy" because of his medication. Id.

   With respect to his daily activities, plaintiff stated that he makes coffee, feeds his

"outdoor stray cats," calls his mother and watches TV (T. 59).  He testified that he doesn't do

anything but go to outpatient therapy twice a week. Id. Plaintiff stated that although he goes to

both individual and group therapy, he does not share much in group, but that he shares "a lot"

with his counselor (T. 60).

   Upon being questioned by his attorney, plaintiff testified that he still had panic attacks

during which he gets very sweaty and he thinks he is "about to die" (T. 61). He stated that he

gets these attacks twice a week. Id. Plaintiff stated that he worries "constantly." Id. He testified

that he always expects that something bad is going to happen to him, so much so that it affects

his ability to carry out tasks (T. 62).  In this regard, plaintiff stated that he cannot even make

Hamburger Helper "without over-dramatizing something, because if it calls for a cup of water

and I'm over a quarter, I'm afraid I'm going to make the whole thing a mess. Or if it calls for

some kind of a teaspoon – two teaspoons of margarine and I give it this, it's going to just make a

disaster of the meal. And I can't comprehend that it's not going to – that's not going to happen.

I'm not – when I make stuff, it seems like it's got to be right to the T or everything's going to be

wrong." Id.  He stated that he has some degree of obsessive-compulsive disorder which he

referred to as a "checking disorder" (T. 63). He stated that he checks his doors and windows "all

the time" and that he is "afraid someone's going to come in and get me for some reason. I don't

know way, but I'm doing this compulsively all the time.  I do – I ask people the same questions

constantly. People get fed up with me." Id.  Plaintiff testified that his inability to perform the

simplest jobs resulted in him being fired from jobs at Danforth, Integrity Distribution and Newco

Energy (T. 64-65).  Plaintiff stated that he has trouble concentrating and socializing (T. 65).  He also stated that his ADHD, anxiety and panic attacks are exacerbated by social situations (T. 67).

Vocational expert Ashley Johnson was called to testify at the hearing by ALJ Fuller (T. 68). Johnson testified that plaintiff could not perform his past work (T. 70).  Johnson opined that plaintiff could perform the work of a mail clerk, a small parts assembler, and a laundry worker. Id. Johnson testified that if plaintiff had to be absent twice a week due to panic attacks, there would be no jobs he could perform (T. 71). She also testified that if plaintiff had to be "off task" for more than ten percent of the workday, he could not sustain competitive employment (T. 72).

## ANALYSIS

### A.  Standard of Review

Plaintiff argues that the Acting Commissioner erred in finding that he was not disabled. The only issue to be determined by this Court is whether the Acting Commissioner's decision that plaintiff was not entitled to benefits is supported by substantial evidence.  See 42 U.S.C. § 405(g);  Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).  The Social Security Act states that, upon review of the Acting Commissioner's decision by the district court, "[t]he findings of the Acting Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive".  42 U.S.C. § 405(g). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. of New York. Inc. v. NLRB, 305 U.S. 197, 229 (1938).

For purposes of entitlement to disability insurance benefits, a person is considered disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

In order to determine whether plaintiff is suffering from a disability, Acting Commissioner must employ a five-step inquiry:

> 1. The Acting Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Acting Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a 'severe impairment,' the Acting Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.
>
> 4. If the impairment is not 'listed' in the regulations, the Acting Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Acting Commissioner then determines whether there is other work which the claimant could perform.

The Acting Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. Talavera v. Astrue, 697 F.3d 145, 151 (2nd Cir. 2012); *see also* 20 C.F.R. §§ 404.1520, 416.920.   Moreover, the ALJ has an affirmative duty to fully develop the record where deficiencies exist. Gold v. Secretary, 463 F.2d 38, 43 (2d Cir. 1972); Swiantek v. Acting Commissioner of Social Security, 588 Fed.Appx. 82, 84 (2nd Cir. 2015).

If a claimant has a mental impairment, the ALJ must employ the "special technique" identified in 20 C.F.R. §404.1520a to evaluate the claimant's symptoms and rate the degree of functional limitation resulting from the impairment. 20 C.F.R. §404.1520a(b). In doing so, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the symptoms, and how a claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. 20 C.F.R. §404.1520a(c).  The ALJ must rate a claimant's degree of limitation in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §404.1520a(c)(3).[7]

With respect to assessing limitations in the first three functional areas, a five point scale is used: none, mild, moderate, marked, and extreme. In the fourth functional area, a four point scale is used: none, one or two, three, four or more. 20 C.F.R. §404.1520a(c)(4).  To satisfy the "Paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A "marked" limitation means "more than moderate, but less than extreme"; one that "interferes seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C). "Repeated" episodes, *e.g.,* of decompensation, means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks" or "more frequent episodes of shorter duration or less frequent episodes of longer duration"

---

[7]   These functional areas are also listed in §12.04B of the Appendix 1 listings and are referred to as the "paragraph B criteria."

which are determined, in an exercise of judgment, to be "of equal severity." <u>Id</u>., § 12.00(C)(4).

See also <u>Roach v. Colvin</u>, 2013 WL 5464748, at *8 (N.D.N.Y. Sept. 30, 2013).

Where the ALJ determines that the claimant has a severe mental impairment, the ALJ

must determine whether that impairment meets or equals a mental disorder listed in Appendix 1.

20 C.F.R. §404.1520a(d)(2). Mental impairments are addressed at §12.01 et seq. of the Appendix

1 listings. If the mental impairment is severe but does not meet or equal the Appendix 1 listing,

the ALJ must consider any limitations resulting from the impairment when making a residual

functional capacity assessment. 20 C.F.R. §404.1520a(d)(3).  When the plaintiff's impairment is

a mental one, special "care must be taken to obtain a precise description of the particular job

duties which are likely to produce tension and anxiety, e.g. speed, precision, complexity of tasks,

independent judgments, working with other people, etc., in order to determine if the claimant's

mental impairment is compatible with the performance of such work."  <u>See</u> Social Security

Ruling 82-62 (1982); <u>Washington v. Shalala</u>, 37 F.3d 1437, 1442 (10th Cir. 1994); <u>Lohbeck v.

Astrue</u>, 258 F. App'x 988 (9th Cir. 2007).


**B.  ALJ Fuller's Determination**

ALJ Fuller determined that plaintiff was not engaged in substantial gainful activity and

that he suffers from the following severe impairments: depressive disorder; anxiety disorder;

attention deficit hyperactivity disorder; and substance abuse disorder (T. 17). She found that

plaintiff's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part

404, Subpart P, Appendix 1. <u>Id</u>.  In assessing the Paragraph B criteria at stages 2 and 3 of the

sequential process, ALJ Fuller found that plaintiff had no limitation in the functional area of

daily living; moderate difficulties in the functional areas of social functioning and concentration;

and no episodes of decompensation (T. 18). After making this assessment, ALJ Fuller stated that

the above consideration of the Paragraph B criteria was not a residual functional capacity

assessment, but was made only for purposes of stages 2 and 3 of the sequential process.  She

acknowledged that the "mental residual functional capacity assessment used at steps 4 and 5 of

the sequential evaluation process requires a more detailed assessment by itemizing various

functions contained in the broad categories found in Paragraph B of the adult mental disorders

listings in 12.00 of the Listing of Impairments" (T. 19).

ALJ Fuller then found that plaintiff possessed the residual functional capacity to perform

a full range of work at all exertional levels with the following non-exertional limitations: "the

claimant is able to remember and carry out one- to two-step instructions; perform simple,

routine, and repetitive  tasks; work in a low-stress job, defined as having only occasional

decision-making required, occasional changes in the work setting, and no fast-paced production

requirements; no interaction with the public and occasional interaction with co-workers." Id.

In making this residual functional capacity determination, ALJ Fuller stated that although

she found that the plaintiff's medically determinable impairments could reasonably be expected

to cause the alleged symptoms, she found that plaintiff's "statements concerning the intensity,

persistence and limiting effects of these symptoms are not credible to the extent they are

inconsistent" with her assessment (T. 20). She found that plaintiff's symptoms relating to his

depression, severe anxiety and history of substance abuse were "well documented," but

concluded that plaintiff's symptoms are not severe enough to preclude him from all work. Id.

She noted that plaintiff did not seek treatment until April of 2010. While ALJ Fuller noted that

plaintiff's GAF score was 45 "which indicated serious impairment in functioning, she stated that

she "was not persuaded by this GAF score" and determined that plaintiff did not maintain such

limitations for a 12 month period. Id. She noted that his condition improved with Xanax, notwithstanding that plaintiff still had "difficulties with sleep, loss of pleasure, poor concentration, excessive worry and feelings of guilt and worthlessness, so his physician also prescribed Zoloft." (T. 20-21).  In addition, ALJ Fuller noted that in September 2010 plaintiff continued to have symptoms of "depressed mood, intense anxiety, feeling like a failure, low self-esteem, and sometimes difficult sleeping through the night" and that his Zoloft was switched to Paxil (T. 21). She stated that in October of 2010 plaintiff "struggled with compliance in attending group therapy sessions" and that these struggles reoccurred in December of 2010 and January of 2011. Id. By May of 2011, ALJ Fuller stated, plaintiff "was doing well, denied feeling depressed and anxious and his mood was 'euthymic with congruent affect'" and that progress notes from June 2011 reflect an improved mood and denial of depressed or anxious feelings.  Id. She stated that these findings are consistent with a residual functional capacity that allows plaintiff to perform simple, routine and repetitive tasks limited to remembering and carrying out one to two step instructions with only occasional decision making, occasional changes in work setting, no fast-paced production requirements, no interaction with the public and occasional interaction with co-workers. Id.

ALJ Fuller gave "significant weight" to the State agency psychological non-examining consultant "Andrews, T. Psychology," who opined that plaintiff would have minimal to no limitations in the ability to follow and understand simple directions perform simple tasks, but would have moderate limitations being able to maintain attention and concentration, maintain a regular schedule, learn new tasks and perform complex tasks (T. 21-22).  She also gave "significant weight" to the opinion of Dr. Baskin, the State agency consulting physician that examined plaintiff, to the extent that Dr. Baskin opined that plaintiff would have minimal to no

limitations in the ability to follow and understand simple directions and perform simple tasks independently.  (T. 22). ALJ Fuller stated that her residual functional capacity assessment of the plaintiff is consistent with the limitations found by Dr. Baskin. Id.

Finally, ALJ Fuller stated that she gave "great weight" to Dr. Gupta's May 5, 2011 report in which it was noted that plaintiff was "doing well, is in good remission" and "denies feeling depressed or anxious." Id. But, ALJ Fuller gave "little weight" to Dr. Gupta's July 14, 2011 report that plaintiff had "marked limitations" in the abilities to understand, remember and carry out simple and complex instructions, make judgments on simple and complex work-related decisions and interact appropriately with the public, supervisors and co-workers" because "it overstates the degree of limitation caused by [plaintiff's] impairments and is inconsistent with the longitudinal mental health progress notes, which indicates improvement with psychotropic medication and therapy." Id.  ALJ Fuller also stated that she gave "little weight" to the opinion of the Department of Veterans Affairs which stated that plaintiff is "unemployable due to service-connected disabilities" because it goes to the ultimate issue which is reserved to the [Acting] Commissioner." Id.

ALJ Fuller found that plaintiff could perform work as a mail clerk, small parts assembler or laundry worker (T. 24).


## C.  Residual Functional Capacity Assessment/ Treating Physician Rule

The plaintiff argues that ALJ Fuller's residual functional capacity assessment is not supported by substantial evidence in the record. (Plaintiff's Memorandum of Law [7-1, p.9]). Specifically, he asserts that ALJ Fuller improperly discounted the opinion of plaintiff's treating physician Dr. Gupta [7-1, p. 12]. Further, he claims that ALJ Fuller failed to consider or discuss

plaintiff's inability to sustain full-time employment because the symptoms of his depression and anxiety would keep him off-task more than 10 percent of the workday. [7-1, p. 10].[8] This argument is essentially an argument that ALJ Fuller failed to properly consider the Paragraph B criteria when making the residual functional capacity assessment.  Finally, plaintiff also argues that the Appeals Council failed to properly consider the records and opinions of Dr. Descutner. [7-1, p.11]. The Acting Commissioner argues that substantial evidence supports ALJ Fuller's residual functional capacity assessment. (Acting Commissioner's Memorandum of Law [11-1, p.15]).

Here, ALJ Fuller's residual functional capacity assessment is not supported by substantial evidence in the record. As discussed above, the record in this case reflects that plaintiff has suffered from various mental impairments which appear to have started when he was in the military.  Although ALJ Fuller found that plaintiff did not seek treatment relating to his mental impairments until April 2010 (T. 20), the record reflects that plaintiff received treatment for mental impairments while he was in the military in the 1980s (T. 13, 281), that he received mental health treatments relating to drug and alcohol abuse in the 1990s (T. 203), and was treating with Dr. Syed for anxiety as early as April 2009 (T. 203).  Also, although ALJ Fuller refused to accept plaintiff's GAF score of 45 because she did not think plaintiff maintained such limitations for a continuous period of 12 months (T. 20), the record reflects that two separate physicians, Dr. Hurley on April 9, 2010 and Dr. Descutner on April 20, 2011, both assigned plaintiff a GAF score of 45 almost exactly 12 months apart (T. 236, 310).

In addition, although ALJ Fuller acknowledged that she was required to re-apply the Paragraph B criteria *in more detail* when making her residual functional capacity assessment at

---

[8]    It is undisputed that the plaintiff could not sustain competitive employment if he was unable to work if his impairments would result in him being off task more less than 10 percent of the workday (T. 72).

stages 4 and 5 of the sequential process (T. 19), she failed to do so. ALJ Fuller does not refer to the Paragraph B criteria expressly at this stage, and the indirect analysis she provides does not adequately discuss plaintiff's limitations in the four functional areas. For example, while ALJ Fuller posed a hypothetical which precluded "fast-paced production," there is no discussion as to what constitutes fast paced production or what the plaintiff's limitations are in that regard. Although the vocational expert testified that plaintiff could perform jobs such as mail handler[9], small parts assembler[10] and laundry worker,[11] there is no discussion as to the production or pace required by these positions. Certainly, employers may impose production, pace or volume requirements upon mail clerks, small parts assemblers or laundry workers. There is no discussion

---

[9]    The Dictionary of Occupation Titles (209.687-026) relied upon by the vocational expert (T. 70) describes the mail clerk as follows: "Sorts incoming mail for distribution and dispatches outgoing mail: Opens envelopes by hand or machine. Stamps date and time of receipt on incoming mail. Sorts mail according to destination and type, such as returned letters, adjustments, bills, orders, and payments. Readdresses undeliverable mail bearing incomplete or incorrect address. Examines outgoing mail for appearance and seals envelopes by hand or machine. Stamps outgoing mail by hand or with postage meter. May fold letters or circulars and insert in envelopes  … . May distribute and collect mail. May weigh mail to determine that postage is correct. May keep record of registered mail. May address mail, using addressing machine … . May be designated according to type of mail handled as Mail Clerk, Bills (clerical)."

[10]   The Dictionary of Occupation Titles (706-684-022) relied upon by the vocational expert (T. 70) describes the small parts assembler position as follows: "Performs any combination of following repetitive tasks on assembly line to mass produce small products, such as ball bearings, automobile door locking units, speedometers, condensers, distributors, ignition coils, drafting table subassemblies, or carburetors: Positions parts in specified relationship to each other, using hands, tweezers, or tongs. Bolts, screws, clips, cements, or otherwise fastens parts together by hand or using handtools or portable powered tools. Frequently works at bench as member of assembly group assembling one or two specific parts and passing unit to another worker. Loads and unloads previously setup machines, such as arbor presses, drill presses, taps, spot-welding machines, riveting machines, milling machines, or broaches, to perform fastening, force fitting, or light metal-cutting operation on assembly line. May be assigned to different work stations as production needs require or shift from one station to another to reduce fatigue factor. May be known according to product assembled."

[11]   The Dictionary of Occupation Titles (361.685-018) relied upon by the vocational expert (T. 70) describes the laundry worker position as follows: "Tends laundering machines to clean articles, such as rags, wiping cloths, filter cloths, bags, sacks, and work clothes: Loads articles into washer and adds specified amount of detergent, soap, or other cleaning agent. Turns valve to fill washer with water. Starts machine that automatically washes and rinses articles. Lifts clean, wet articles from washer and places them successively into wringers and driers for measured time cycles. Sorts dried articles according to identification numbers or type. Folds and places item in appropriate storage bin. Lubricates machines, using grease gun and oil can. May dissolve soap granules in hot water and steam to make liquid soap. May mend torn articles, using needle and thread. May sort and count articles to verify quantities on laundry lists. May soak contaminated articles in neutralizer solution in vat to precondition articles for washing. May mix dyes and bleaches according to formula, and dye and bleach specified articles."

in the record as to what those requirements are, and what percentage of those jobs existing in national economy demand pace or production requirements that may be beyond the plaintiff's ability. Also, the general job descriptions of the positions identified by the vocational expert and relied upon by ALJ Fuller appear to involve multiple functions that require more than following "one to two step instructions" to perform a simple routine task as posed by the hypothetical. While some subset of these positions may be limited to only performing one simple task which involves the carrying out of "one to two step" instructions, there was no discussion as to how many of those positions exist in the national economy. ALJ Fuller's failure to adequately discuss the Paragraph B criteria when making her residual functional capacity assessment requires that this case be remanded to the Acting Commissioner.[12]

In addition, the "treating physician rule" directs the Acting Commissioner to give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence. Halloran v. Barnhart, 362 F.3d 28, 32 (2nd Cir. 2004)(per curiam); 20 C.F.R. §404.1527(c)(2). The treating physician rule applies to the Appeals Council as well. Snell v. Apfel, 177 F.3d 28, 134 (2nd Cir. 1999); Camarata v. Colvin, 2015 WL 4598811 (N.D.N.Y. 2015)("When new materials are submitted from treating physicians, the Appeals Council is 'obligated to provide an explanation for [its] decision not to afford controlling weight to an assessment apparently provided by Plaintiff's treating physician.'").

Where mental health treatment is at issue, the treating physician rule takes on added importance. A mental health patient may have good days and bad days; he may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced

---

[12]    Upon remand, the Acting Commissioner should also take note of plaintiff's continued struggles with keeping appointments, as evidence by the various instances when plaintiff was late or otherwise missed meetings and deadlines relating to this Administrative appeal (T. 10, 183, 249).

understanding of the patient's health that cannot be readily achieved by a single consultative examination. *See* <u>Canales v. Comm'r of Soc. Sec'y</u>, 698 F.Supp.2d 335, 342 (E.D.N.Y.2010) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health") (citing <u>Richardson v. Astrue</u>, 2009 WL 4793994, at *7 (S.D.N.Y. Dec. 14, 2009)).[13]

In this case, ALJ Fuller erred by improperly discrediting the opinion of Dr. Gupta in favor of the opinions of "Andrews, T. Psychology," who appears to be a non-examining consulting physician, and Dr. Baskin, a consulting psychiatrist.  Initially, it should be noted that Dr. Baskin's evaluation is inconsistent with ALJ Fuller's residual functional capacity assessment inasmuch as although she stated that plaintiff would have minimal to no limitations in following simple instructions, she also found that plaintiff's memory skills were mildly impaired, that his judgment was fair to poor, that he had a moderate limitation in being able to maintain attention, that he would have significant limitations in being able to adequately relate to others, and that he was not able to manage his own funds (T. 213-215). Dr. Baskin concluded that plaintiff should consider "more intensive" treatment with respect to his psychological problems and that his prognosis was only guarded (T. 215).  Such an evaluation does not support a finding that plaintiff could perform full-time work for a sustained period of time consistent with ALJ Fuller's residual functional capacity assessment.

---

[13]     When the ALJ discredits the opinion of a treating physician, the regulations direct her to "always give good reasons in [her] notice of determination or decision for the weight [given a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); <u>Snell</u>, 177 F.3d at 134. The ALJ first must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. <u>Halloran</u>, 362 F.3d 28, 32; *see also* 20 C.F.R. § 404.1527(c)(2)-(6).  The Second Circuit has advised that the courts should not "hesitate to remand when the [Acting] Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion." <u>Halloran</u>, 362 F.3d at 33.

Further, ALJ Fuller discounted Dr. Gupta's residual functional capacity evaluation as being inconsistent with Dr. Gupta's own findings that plaintiff had shown some improvement during a visit on May 5, 2011 (i.e. plaintiff was "doing well" and denied feelings of depression and anxiety) (T. 22).  Notwithstanding that finding on May 5, 2011, Dr. Gupta subsequently provided a residual functional capacity assessment in July of 2011 which stated that plaintiff continued to struggle with decision making and had marked restrictions which would prevent plaintiff from functioning effectively in a work setting (T. 275-76). Depression continued to be one of the plaintiff's complaints on February 9, 2012 (T. 327).  Dr. Gupta's assessment is also consistent with the medical findings by Dr. Hurley, Dr. Descutner and counselor Henderson.  An ALJ cannot rely upon temporary relief from some of the symptoms to support a conclusion that a treating physician's opinion is not entitled to controlling weight. Ruiz v. Apfel, 98 F. Supp. 2d 200, 208 (D. Conn. 1999). The longitudinal record reflects that plaintiff suffered from persistent symptoms of depression and anxiety which are consistent with the residual functional capacity assessment made by Dr. Gupta in July of 2011.

Moreover, it is well-established that "the ALJ cannot rely solely on [the] RFCs [of the consulting examiners] as evidence contradicting the treating physician RFC. This is because an inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician." Cabibi v. Colvin, 50 F. Supp. 3d 213, 234 (E.D.N.Y. 2014) citing Moore v. Astrue, 2009 WL 2581718, *10 n. 22 (E.D.N.Y.  2009). Indeed, "[t]he Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.' " Harris v. Astrue, 2009 WL 2386039, *14 (E.D.N.Y. 2009)(quoting Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir.1990)). "This is because 'consultative exams are often brief, are generally performed without

the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.' " Id. (quoting Cruz, 912 F.2d at 13).

ALJ Fuller erred by failing to discuss the Paragraph B criteria in detail when making her residual functional capacity assessment and by giving "significant weight" the opinion of the non-examining consultant over the opinion of Dr. Gupta. She also erred by misinterpreting the opinion of Dr. Baskin, and failing to account for the medical evidence presented by Dr. Gupta, Dr. Descutner, and counselor Henderson when making as assessment as to whether plaintiff could properly function in a work setting.  For these reasons, this case should be remanded to the Acting Commissioner for further consideration of plaintiff's claim.


**CONCLUSION**

For these reasons, I recommend that plaintiff's motion for judgment on the pleadings [7] be granted to the extent that this case be remanded to the Acting Commissioner for further proceedings consistent with this Report and Recommendation and that the Acting Commissioner's motion for judgement on the pleadings [11] be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by November 9, 2015 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate

judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: October 21, 2015

<u>/s/ Jeremiah J. McCarthy</u>
JEREMIAH J. MCCARTHY
United States Magistrate Judge